UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| MARK A. HOLUM,<br><br>        Plaintiff,<br><br>       v.<br><br>EXTENDICARE HOMES, INC.,<br>EXTENDICARE HEALTH SERVICES,<br>INC., and EXTENDICARE HEALTH<br>FACILITIES, INC.,<br><br>        Defendants. | NO. CV-08-0081-EFS<br><br>**ORDER ENTERING COURT'S RULINGS FROM FEBRUARY 25, 2009 HEARING** |

    A hearing occurred in the above-captioned matter on February 25, 2009, in Spokane. Plaintiff Mark A. Holum was present, represented by Marcia M. Meade and Robert F. Greer, II; Patrick J. Cronin appeared on Defendants' behalf. Before the Court were Defendants' motions to strike (Ct. Recs. 40, 41, 42, & 43) and motion for summary judgment (Ct. Rec. 10), as well as Plaintiff's oral motion to certify question to the Washington Supreme Court. The Court reviewed the submitted material, examined exhibits, listened to oral argument, and then granted and denied in part Defendants' motions to strike, granted Defendants' summary judgment motion, and denied Plaintiff's oral motion for certification. This Order serves to memorialize and supplement the Court's oral rulings.

ORDER ~ 1

# I. Background[1]

Troy Harris is a 37-year-old male suffering from developmental delays, cerebral palsy, bipolar disorder, depression, adjustment disorder, anxiety, seizure disorder, and recurrent aspiration pneumonia secondary to his inability to clear his lungs. (Ct. Recs. 31 at 3; 32 at 2.) On November 10, 2004, Mr. Harris' parents, physicians, current care representatives, and the Department of Social and Health Services met to discuss treatment and placement options. (Ct. Rec. 13-2 at 16.) After multiple "care conferences," a decision was made to transfer Mr. Harris from a group home to the Gardens on University ("The Gardens"), a skilled nursing facility located in Spokane, Washington. (Ct. Recs. 13-2 at 16; 14 at 3.)

The Gardens, which is owned and operated by Defendant Extendicare Homes, Inc., screens all patients before admission; prospective patients that present a current risk of harm to self or others are not allowed. (Ct. Rec. 47 at 3.) The Gardens screened Mr. Harris and admitted him on November 17, 2004. (Ct. Rec. 13-2 at 8.) Although Mr. Harris' records contain no mention of past physical aggression, the Gardens' nursing staff advised management repeatedly that mentally ill patients present a danger to other residents and the staff. (Ct. Recs. 13-2 at 8-19; 32 at 4.)

---

[1] In a motion for summary judgment, the facts are set forth in a light most favorable to the nonmoving party - here, that is Plaintiff. *Leslie v. Grupo ICA,* 198 F.3d 1152, 1158 (9th Cir. 1999).

ORDER ~ 2

After admission, the Gardens conducts a seven-day evaluation in order to develop a proper treatment plan for new patients. (Ct. Rec. 13 at 4.) This evaluation, known as the Minimum Data Set ("MDS"), examines, *inter alia*, newly-admitted patients' cognitive patterns, communication patterns, behavior patterns, psychosocial well-being, and physical functioning. (Ct. Rec. 13-2 at 20-29.) Sincerie Arnold, a registered nurse employed at the Gardens, supervised Mr. Harris' seven-day MDS assessment. *Id.* at 28.

Ms. Arnold reported that, between November 17 and November 24, 2004, Mr. Harris suffered from periods of restlessness, memory loss, poor decision-making, difficulty communicating, and pained expressions on his face. *Id.* at 24-25. Mr. Harris did not, however, exhibit verbally abusive behavior, physically abusive behavior, socially disruptive behavior, anger with himself, anger with others, or resistance to care. *Id.* at 25. Importantly, Mr. Harris was also at ease in interacting with others and was not restrained at any point since his arrival on November 17, 2004. *Id.* at 28.

Despite Mr. Harris' lack of documented aggressive behavior, he still presented a unique challenge for the Gardens' nursing staff. Mr. Harris' developmental delays, combined with his mental illness, made it possible for him to deteriorate into a psychotic state. (Ct. Rec. 32 at 6.) It also made communicating with Mr. Harris difficult because he could not grasp basic social interactions and thinking. (Ct. Rec. 30 at 4.) Additionally, Mr. Harris' mobility significantly increased his risk of harm to other residents and staff because he could wander if left unattended. (Ct. Rec. 32 at 6.) Mr. Harris therefore required higher

ORDER ~ 3

staff numbers to provide the requisite level of care. *Id.* at 5. And finally, complications arising from Mr. Harris' medical conditions required frequent hospitalizations. (Ct. Rec. 13-2 at 13.)

Concerns about Mr. Harris' presence at the Gardens were voiced multiple times by several nurses. For example, Ms. Arnold informed management that the Gardens did not have the staff or resources to handle Mr. Harris, and that someone was going to be seriously injured. *Id.* at 12.[2] Michelle Rashka, a certified nurses aid working at the Gardens, informed management that Mr. Harris was not a suitable resident because his mental retardation prevented him from understanding that it was wrong to grab or push people. (Ct. Rec. 33 at 4.) She also stated that Mr. Harris exhibited confrontational behavior at his prior group home. *Id.* at 3. Susan Goodrick, a registered nurse working at the Gardens, informed management that Mr. Harris' behavior was "out of control" and that he needed to be discharged form the Gardens because he was going to hurt himself or others. (Ct. Rec. 31 at 4.)

On November 26, 2004, Mr. Harris assaulted a kitchen staff worker attempting to provide Mr. Harris with one-to-one care.[3] At 8:30 a.m. on November 29, 2004, Mr. Harris was admitted to Sacred Heart Medical Center due to increased respiratory difficulties, agitation, and behavioral

---

[2] While Ms. Arnold alleges that she expressed her concerns about Mr. Harris to management in writing on multiple occasions, no documented evidence is before the Court. (Ct. Rec. 32 at 7.)

[3] Although an incident report allegedly exists, no documented evidence is before the Court.

ORDER ~ 4

problems. (Ct. Recs. 13-2 at 47; 31 at 3.) Sacred Heart staff restrained Mr. Harris for safety reasons because he was wandering around the hospital. (Ct. Rec. 31-2 at 15.) Sacred Heart treated and discharged Mr. Harris in less than two (2) hours. (Ct. Rec. 32-3 at 44.)

After returning to the Gardens, Mr. Harris had two (2) documented instances of assaultive behavior. At 4:30 p.m., he exhibited "uncontrolled psychotic behavior," requiring his father to physically restrain him; at 6:30 p.m., he kicked a nurse in the stomach and pulled on her neck. (Ct. Rec. 13-2 at 47.) Contemporaneous medical records show that Mr. Harris calmed shortly after the second incident and rested quietly through the night. *Id.* at 48.

At 9:30 a.m. on November 30, 2004, Plaintiff, a registered nurse employed at the Gardens, entered Mr. Harris' room in order to administer tube feeding. (Ct. Rec. 30 at 4.) While Plaintiff had his back turned, Mr. Harris attacked Plaintiff from behind. Mr. Harris' parents were present and able to forcibly remove him from Plaintiff's back. (Ct. Rec. 13-2 at 48.) Despite Mr. Harris' parents' quick response, Plaintiff sustained serious injuries. Treatment included physical therapy, shoulder surgery, and a spinal fusion. Plaintiff still experiences physical limitations due to the muscle and nerve injury. (Ct. Rec. 30 at 5.)

On November 30, 2007, Plaintiff filed a Complaint in Spokane County Superior Court alleging that Defendants are liable for injuries he sustained after being attacked by Mr. Harris. Defendants removed the case to federal court on March 3, 2008. (Ct. Rec. 1.) On December 2, 2008, Defendants moved for summary judgment on grounds that Plaintiff's

ORDER ~ 5

claim is precluded by Washington's Industrial Insurance Act, RCW 51.04.010.

## II. Discussion

**A.  Summary Judgment Standard**

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  Once a party has moved for summary judgment, the opposing party must point to specific facts establishing that there is a genuine issue for trial.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).  If the nonmoving party fails to make such a showing for any of the elements essential to its case for which it bears the burden of proof, the trial court should grant the summary judgment motion.  *Id.* at 322.  "When the moving party has carried its burden of [showing that it is entitled to judgment as a matter of law], its opponent must do more than show that there is some metaphysical doubt as to material facts.  In the language of [Rule 56], the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986) (citations omitted) (emphasis in original opinion).

When considering a motion for summary judgment, a court should not weigh the evidence or assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255

ORDER ~ 6

(1986). This does not mean that a court will accept as true assertions made by the non-moving party that are flatly contradicted by the record. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

**B.   Motions to Strike (Ct. Recs. 40-43)**

Defendants moved to strike several portions of several declarations submitted in opposition to their motion for summary judgment. (Ct. Recs. 40-43.) For the reasons articulated on the record, the Court ruled as follows:

| Declaration | Location | Ruling |
|---|---|---|
| Mark Holum | Paragraph 10 | Deny |
| Mark Holum | Paragraph 14 | Grant (speculative) |
| Mark Holum | Paragraph 17 | Grant (foundation, amorphous, qualifications) |
| Sincerie Arnold | Paragraph 11 | Deny |
| Sincerie Arnold | Paragraph 12 | Grant (personal knowledge, foundation, speculative) |
| Sincerie Arnold | Paragraph 13 | Grant in Part - 1st Sentence (personal knowledge, foundation, speculative); Deny in Part - 2nd Sentence |

ORDER ~ 7

| Sincerie Arnold | Paragraphs 14-15 | Deny |
| --- | --- | --- |
| Sincerie Arnold | Paragraph 16 | Grant (personal knowledge, foundation, speculative) |
| Sincerie Arnold | Paragraph 17 | Deny |
| Sincerie Arnold | Paragraph 18 | Grant in Part - 1st Sentence (personal knowledge, foundation, speculative); Deny in Part - 2nd Sentence |
| Sincerie Arnold | Paragraphs 19-20, 24-28, and 30-34 | Deny |
| Sincerie Arnold | Paragraph 23 | Grant (contradicted by medical records) |
| Sincerie Arnold | Paragraphs 35-37 | Grant (personal knowledge, foundation, qualifications) |
| Sincerie Arnold | Paragraphs 38-45 | Deny |
| Sincerie Arnold | Paragraph 48 | Grant in Part - 1st + 2nd Sentences (foundation, qualifications); Deny in Part (Last Sentence) |
| Sincerie Arnold | Paragraph 50 | Deny |
| Sincerie Arnold | Paragraph 54 | Grant in Part - 2nd Sentence (foundation, qualifications); Deny in Part - 1st Sentence |

ORDER ~ 8

| Sincerie Arnold | Paragraph 55 | Grant in Part - 1st & 3rd Sentences (foundation, personal knowledge, qualifications); Deny in Part - 2nd Sentence |
| Sincerie Arnold | Paragraph 56 | Grant (personal knowledge, foundation, qualifications) |
| Sincerie Arnold | Paragraph 58 | Grant (personal knowledge, foundation) |
| Sincerie Arnold | Paragraphs 59-60 | Deny |
| Sincerie Arnold | Paragraphs 61-62 | Grant (personal knowledge, foundation, qualifications) |
| Sincerie Arnold | Paragraph 63 | Deny |
| Sincerie Arnold | Paragraph 64 | Grant in Part - 1st Sentence (personal knowledge, foundation, speculative); Deny in Part - 2nd Sentence |
| Michelle Rashka | Paragraphs 6-7 | Grant (personal knowledge, foundation) |
| Michelle Rashka | Paragraph 8 | Deny |
| Michelle Rashka | Paragraph 9 | Grant (personal knowledge, foundation) |
| Michelle Rashka | Paragraph 10 | Grant in Part - 1st Sentence (personal knowledge, foundation); Deny in Part - 2nd Sentence |

ORDER ~ 9

| Michelle Rashka | Paragraphs 11-12 | Grant in Part - 1st Sentence (personal knowledge, foundation, qualifications); Deny in Part - Remainder |
| Michelle Rashka | Paragraph 13 | Grant in Part - 3rd Sentence (personal knowledge, foundation, speculation, hearsay); Deny in Part - Remainder |
| Sue Goodrick | Paragraph 9 | Deny |
| Sue Goodrick | Paragraph 11 | Deny |
| Sue Goodrick | Paragraph 12 | Deny |
| Sue Goodrick | Paragraphs 15-16 | Deny |
| Sue Goodrick | Paragraphs 17-20 | Grant (personal knowledge, foundation, qualifications) |

**C.   Multiple Entities**

Plaintiff sued Extendicare Homes, Inc., Extendicare Health Services, Inc., and Extendicare Health Facilities, Inc.  Defendant argues that the latter two (2) entities are not proper parties to this action because they have no involvement in either ownership or management of the Gardens.  (Ct. Rec. 12 at 12.)  At the hearing, Plaintiff did not oppose dismissing either Extendicare Health Services, Inc. or Extendicare Health Facilities, Inc.  Accordingly, the Court dismisses these parties from the action.

\\
\\

ORDER ~ 10

**D.   Employer Immunity Under RCW 51.04.010**

The Washington Industrial Insurance Act ("WIIA"), enacted in 1911, grants Washington employers immunity from lawsuits arising from workplace injuries. *Birklid v. Boeing*, 127 Wn.2d 853, 858 (1995). In exchange for immunity, the WIIA created a "swift, no-fault compensation system for injuries on the job." *Id.* Employer immunity is not absolute; a limited exception exists when an employer intentionally injures an employee:

> If injury results to a worker from the <u>deliberate intention of his or her employer to produce such injury,</u> the worker or beneficiary of the worker shall have the privilege to take under this title and also have cause of action against the employer as if this title had not been enacted, for any damages in excess of compensation and benefits paid or payable under this title.

RCW 51.24.020 (emphasis added). "Deliberate intention" means "(1) the employer had actual knowledge that an injury was certain to occur and (2) the employer willfully disregarded that knowledge." *Birklid*, 127 Wn.2d at 865. This two-prong test for deliberate intention, known as the *Birklid* test, is narrowly interpreted because Washington courts are "mindful of the narrow interpretation . . . historically given to RCW 51.24.020, and of the appropriate deference four generations of Washington judges have shown to the legislative intent embodied in RCW 51.04.010." *Id.* This means that negligence, gross negligence, or even failure to observe safety procedures does not rise to the level of deliberate intention. *Vallandigham v. Clover Park Sch. Dist. No. 400*, 154 Wn.2d 16, 27 (2005). Instead, there must be a "specific intent to injure." *Id.*

\\
\\

ORDER ~ 11

**1.   Actual Knowledge**

Defendants argue that Mr. Harris' limited prior aggression and unpredictable behavior made it impossible for management to know that Plaintiff's injury was certain to occur. (Ct. Rec. 12 at 11.) Plaintiff insists that genuine factual issues exist as to whether Mr. Harris' behavioral history made it certain that he would physically assault a nurse. (Ct. Rec. 29 at 9.)

Even viewing all the facts and evidence in Plaintiff's favor, he cannot meet the *Birklid* test's first prong. Two (2) cases are informative on this issue: *Vallandigham v. Clover Park School District No. 400*, 154 Wn.2d 16 (2005), and *Brame v. Western State Hospital*, 136 Wn. App. 740 (2007).

In *Vallandigham*, two (2) special education teachers sued the Clover Park School District to recover for injuries caused by a severely disabled special education student. 154 Wn.2d at 17. The student, who suffered from epilepsy, mental retardation, and autism, assaulted both students and teachers on 96 separate occasions during the 1999-2000 school year. The student's assaultive behavior included scratching, hitting, pulling hair, biting, pinching, head butting, and grabbing glasses. *Id.* at 19. The first special education teacher was injured when the student head-butted her, causing her to fall backwards, hit her head on a counter, and lose consciousness; the second special education teacher was injured when the student bit her breast, leaving a mark. *Id.* at 20. The trial court dismissed the suit, finding that the teachers did not fall under WIIA's narrow exceptions to employer immunity. *Id.* at 24.

ORDER ~ 12

The Washington Supreme Court affirmed. In doing so, the Supreme Court emphasized that "the first prong of the *Birklid* test can be met in only very limited circumstances where continued injury is not only substantially certain but *certain* to occur." *Id.* at 32 (emphasis in original). The Supreme Court found that a special needs child's behavior is "far from predictable," making it impossible to know with certainty whether violent behavior - even if frequent - "would not cease as quickly as it began." *Id.* at 33.

In *Brame*, Western State Hospital employees sought to recover for injuries caused by assaults from patients with mental illnesses. The employees insisted recovery was proper because the hospital knew with certainty that patients would assault staff and it willfully disregarded this knowledge. 136 Wn. App. at 748-49. For support, the employees relied on the history of patient-to-staff assaults. *Id.* at 749. The trial court dismissed the suit, finding that the employees did not fall under WIIA's narrow exception to employer immunity. *Id.*

The Court of Appeals affirmed. In doing so, the court concluded that "past patient-to-staff assaults demonstrate, at the most, that such assaults are foreseeable, not that they are certain." *Id.* Importantly, the court relied on *Vallandigham* and found that "[l]ike the behavior of a child with special needs, the behavior of an individual with mental illness is 'far from predictable.' A patient's mental health may regress without warning and for unknown reasons." *Id.* (internal citations omitted).

Plaintiff attempts to distinguish both these cases by arguing that Mr. Harris' assaultive behavior, unlike the student in *Vallandigham* and

ORDER ~ 13

the mental patients in *Brame*, was entirely predictable. (Ct. Rec. 29 at 12.)  This argument is belied by Mr. Harris' medical records - medical records prepared by licensed physicians, licensed nurses, and certified nurse assistants employed at the Gardens and elsewhere.  For example, Mr. Harris' admission records make no mention of previous violence or aggressive behavior.  The seven-day MDS evaluation conducted by Ms. Arnold revealed no signs of verbally abusive behavior, physically abusive behavior, socially disruptive behavior, or resistance to care.  (Ct. Rec. 13-2 at 20-29.)[4]  And the contemporaneous progress notes filled out by treating nurses on a daily basis show no violent, aggressive, or assaultive behavior between Mr. Harris' admission date and November 29, 2004.  *Id.* at 37-47.

According to Ms. Arnold, Mr. Harris did assault a kitchen employee on November 26, 2004.  Assuming this is true for summary judgment purposes, this means that Mr. Harris exhibited assaultive behavior on only three (3) occasions over nearly two (2) weeks - the other two (2) incidents occurred within hours of each other on November 29, 2004, after Mr. Harris was discharged from Sacred Heart.  These random assaults - spanned over two (2) weeks - are far from predictable.  Like the student in *Vallandigham* and the mental patients in *Brame*, the Gardens' management "could not *know* what [Mr. Harris'] behavior would be from day to day.

---

[4]Ms. Arnold's seven-day MDS evaluation seemingly contradicts her Declaration, which states that she consistently and repeatedly warned management that Mr. Harris was a danger to others. (Ct. Rec. 32 at 7.)

ORDER ~ 14

<400>

No one could be sure that [Mr. Harris'] behavior would not cease as quickly as it began." *Vallandigham*, 154 Wn.2d at 33.

It is presumed true that the Gardens' nursing staff repeatedly warned management that mentally ill patients present a danger to other residents and the staff. (Ct. Rec. 32 at 4.)  It is also presumed true that the Gardens' nursing staff repeatedly warned management that they lacked the staff or resources to handle Mr. Harris, and that someone was going to be seriously injured.  *Id.* at 12.  These repeated warnings, in conjunction with Mr. Harris' prior behavior, at best establishes that there was a substantial certainty that an employee or resident would be injured.  Substantial certainty is not enough; <u>certainty</u> of injury is required.  *Vallandigham*, 154 Wn.2d at 34 (emphasis added).

There are only four (4) reported cases where Washington courts have found that the *Birklid* test's first prong was met.  *See Birklid v. Boeing*, 127 Wn.2d 853 (1995) (finding that Boeing knew its employees would become ill from impregnating manufactured parts with resin when, during pre-production testing, employees complained of dizziness, burning eyes, and stomach ailments); *Baker v. Schatz*, 80 Wn. App. 775 (1996) (finding that employer knew with certainty that its employees would become ill from repeated toxic chemical exposure); *Hope v. Larry's Markets*, 108 Wn. App. 185 (2001) (finding that employer knew injury was certain to occur when an employee repeatedly complained that cleaning chemicals were causing burns and a severe rash); and *Stenger v. Stanwood Sch. Dist.*, 95 Wn. App. 802 (1999) (finding that school district knew its employees would continue to be injured when a developmentally-delayed student inflicted over 1,300 injuries to school staff over four years).

ORDER ~ 15

*Stenger* is the only Washington case finding that the *Birklid* test's first prong was met absent injuries caused by chemical exposure. *Vallandigham*, 154 Wn.2d at 31. *Stenger's* precedent did not last. In *Vallandigham*, the Washington Supreme Court "disapproved" *Stenger's* conclusion that *Birklid's* first prong was met, reasoning that even 1,300 assaults inflicted over four (4) years was insufficient to establish that the employer had actual knowledge that injury was certain to occur in the future. *Id.* at 34.[5] In other words, no surviving Washington court decision has found that the *Birklid* test's first prong was met when an employees' injuries were caused by a mentally handicapped individual.

The standard for satisfying *Birklid's* first prong is exceptionally high. "Disregard of a *risk* of injury is not sufficient to meet the first *Birklid* prong; *certainty* of actual harm must be known and ignored." *Id.* at 28 (emphasis in original). Given the unpredictable nature of developmentally-delayed, mentally ill individuals like Mr. Harris, at no point could the Gardens' management have been *certain* that staff assaults would continue. Summary judgment is proper.

**2. Willful Disregard of Certain Injury**

Because Plaintiff cannot meet *Birklid's* first prong, it is unnecessary to consider whether the Gardens' management willfully disregarded the knowledge of certain injury.

---

[5]It is unclear why *Strenger* was not appealed to the Washington Supreme Court.

ORDER ~ 16

**E.    Oral Motion to Certify Issue to the Washington Supreme Court**

After the Court orally granted Defendants' summary judgment motion, Plaintiff moved to certify a question to the Washington Supreme Court. For the reasons articulated on the record, the Court denied this motion because the Court's Scheduling Order required certification issues to be identified no later than the dispositive motion filing date. (Ct. Rec. 9.)  This did not occur.

### III. Conclusion

For the reasons articulated on the record, **IT IS HEREBY ORDERED**:

1. Defendants' Motion to Strike Portions of the Declaration of Mark Holum **(Ct. Rec. 40)** is **GRANTED AND DENIED IN PART**;

2. Defendants' Motion to Strike Portions of the Declaration of Michelle Rashka **(Ct. Rec. 41)** is **GRANTED AND DENIED IN PART**;

3. Defendants' Motion to Strike Portions of the Declaration of Sincerie Arnold **(Ct. Rec. 42)** is **GRANTED AND DENIED IN PART**;

4. Defendants' Motions to Strike Portions of the Declaration of Sue Goodrick **(Ct. Rec. 43)** is **GRANTED AND DENIED IN PART**;

5. Plaintiff's oral motion to certify question to the Washington Supreme Court is **DENIED**;

6. Defendants' Motion for Summary Judgment **(Ct. Rec. 10)** is **GRANTED**;

7. **Judgment** shall be entered in Defendants' favor;

8. All pending hearing and trial dates are **STRICKEN**;

9. All remaining pending motions are **DENIED AS MOOT**; and

10. This file shall be **CLOSED**.

\\

\\

ORDER ~ 17

1 **IT IS SO ORDERED.** The District Court Executive is directed to enter
2 this Order and to provide copies to all counsel.
3     **DATED** this ___6th___ day of March 2009.

<pre>
                         S/ Edward F. Shea
                         EDWARD F. SHEA
                    United States District Judge
</pre>

Q:\Civil\2008\81.MSJ.wpd

ORDER ~ 18